# CHARLESTON.

## HOWARD v. TATUM et al.

Submitted January 22, 1918.   Decided January 29, 1918.

1. CORPORATIONS—*Gift of Assets—Ultra Vires Act.*

   A corporation, owning a patent right for a certain kind of furnace for making steel castings and holding a portion of the capital stock of another corporation, issued to it in consideration of the right to use such patent and its agreement to pay certain royalties on its products, has a right to sell such stock and turn the proceeds over to the operating company, to relieve it of financial embarrassment, with the understanding that such proceeds shall be accounted for upon a satisfactory basis, thereafter to be determined. Such transaction is not a gift of the company's assets nor an ultra vires act. (p. 563).

2. SAME—*Sale of Assets—Resolution—Ratification.*

   A stockholders' resolution authorizing a sale of part of a corporation's assets and a certain disposition to be made of the funds, passed at a meeting at which all were not present and of which some did not have notice, is ratified by the subsequent action of the stockholders at a meeting of which due notice was given, rejecting a resolution offered requesting the directors to institute suit for the recovery of the assets or their value (p. 563).

3. SAME—*Sale of Property—Purchase by Director.*

   A director violates no official duty and is guilty of no fraud, in purchasing the property of his corporation pursuant to a stockholders' resolution fixing the price at which it should be sold. (p. 566).

Appeal from Circuit Court, Ohio County.

Suit by Mrs. A. J. Howard and others against Peebles Tatum and others.   Decree for defendants, and plaintiffs appeal.

*Affirmed.*

*John A. Howard* and *J. M. Ritz,* for appellants.
*John J. Coniff,* for appellees.

WILLIAMS, JUDGE:

Mrs. A. J. Howard, a stockholder in the Carr Furnace Company, brought this suit on behalf of herself and all other stockholders against Peebles Tatum, L. J. Bayha, A. S. List,

W. M. Carr, S. M. Noyes, the said Carr Furnace Co., a corporation, and the Wheeling Steel Casting Co., also a corpor poration, charging the aforesaid individual defendants with fraud in converting certain assets of the Carr Furnace Co. without its authority and turning over the proceeds thereof to the Wheeling Steel Casting Co. without any consideration therefor; with having fraudulently purchased its assets at much less than their actual value, and with having violated their duty as its officers and directors. She avers she has made fruitless efforts to induce the directors of said company to bring suit or take some action to redress her alleged grievances by applying first directly to them and later to the stockholders in general meeting, and being unable to get any relief through the voluntary action of the company or its officers, she was compelled to sue in her own proper person. She prays that the individual defendants may be required to discover and disclose what the assets of said company purchased by them were actually worth, what they paid for the same and what disposition they made of the proceeds; that they be required to account to the company for the same; and that an accounting be had between said company and the Wheeling Steel Casting Co. She prays also for general relief. The individual defendants answered, denying the averments of the bill charging them with fraud, dereliction of duty and want of proper authority to dispose of the company's assets, and admitting the existence of an alleged contract made between the aforesaid company and the Wheeling Steel Casting Co. and that there had been no settlement between them of the matters and things therein contained. J. M. Ritz, one of the appellants, was not an original party to the bill but filed his petition adopting its averments and uniting therein and by order of court was made a party plaintiff. Depositions were taken on behalf of both plaintiffs and defendants, the cause was heard on the 31st of January, 1917, and a final decree entered denying all relief to plaintiffs, except an accounting between the two corporations, which was ordered to be taken and for that purpose the cause was referred to a commissioner.

Plaintiffs have appealed and assign numerous errors, the

merit of all of which depend upon whether the individual defendants were authorized by the Carr Furnace Co. to make sale, at the price of $25,000, of the capital stock which it held in the Wheeling Steel Casting Co. of the par value of $40,000, whether they were guilty of fraud or a breach of official duty in buying it themselves and turning over the proceeds to the Wheeling Steel Casting Co. without taking any security for its repayment.

The Carr Furnace Co. was incorporated in November, 1910, for the purpose of purchasing and testing a certain patent right for a steel casting furnace, which had been issued to Wm. M. Carr who became one of its stockholders. Its authorized capital was $10,000, one-half of which was taken by said Carr in consideration for his patent, and the balance purchased at par by L. J. Bayha, Peebles Tatum, C. E. Blue, A. S. List and S. M. Noyes. The company acquired a piece of land and erected on it a small furnace for the purpose of testing the practicability of the patent and, being satisfied that it could be made a profitable business if a larger amount of capital could be raised for exploiting it, the stockholders organized another corporation with an authorized capital of $100,000, which was named the Alloy Steel Casting Company. This company was organized sometime in 1911, about a year after the first one was formed. It later changed its name to the Wheeling Steel Casting Co., without changing its organization. These two corporations will be hereinafter spoken of as the Carr Co. and the Casting Co., respectively.

On November 19, 1911, a contract was entered into between the two companies whereby the Carr Co. assigned to the Casting Co. all its contractual rights and all its property and improvements thereon, except its patent, and the exclusive privilege of constructing and operating the patented furnace within a certain territory including a large number of states. In consideration therefor, the Casting Co. assigned to the Carr Co. four hundred shares of its capital stock of the par value of $40,000, assumed its debts and contractual liabilities, and agreed to build furnaces according to the patent, manufacture steel castings and pay the Carr Co. on the 15th of each month certain royalties thereon, depending on the weight

and kind of castings. Thereafter the property of the Carr Co.
consisted only of its rights under this contract, the $40,000
of stock in the Casting Co. and its patent right. Nearly all
the remaining $60,000 of the Casting Co.'s stock was sub-
scribed and paid for at par. It began operations immediately,
under the aforesaid agreement, and, within a year, appears
to have exhausted its capital and become heavily involved in
debt, so much so, some of the witnesses say, that it would
have gone into bankruptcy if it had not succeeded in getting
additional funds. Its financial distress was discussed among
the officers and principal stockholders of both the companies,
and it was agreed among them that the $40,000 of capital
stock owned by the Carr Co. should be sold and the proceeds
turned over to the Casting Co. in order to put it on its feet
and enable it, if possible, to succeed, for it was apparent that
failure of the Casting Co. meant serious loss to, if not com-
plete failure of the Carr Co. as well. Accordingly at a meet-
ing of the stockholders of the Carr Co., held on the 24th of
September, 1912, a resolution was passed authorizing a sale
of that stock at $62.50 per share, and the turning over of the
fund to the Casting Co., with the understanding "that some
suitable arrangement should thereafter be made between the
two companies, so as to make suitable reimbursement to said
Carr Furnace Company for said stock so sold, which said ar-
rangement shall be satisfactory to proper representatives of
both Companies."

It is contended, (1) that no such resolution was passed by
the stockholders; (2) that, if it was passed, it was done ir-
regularly and without notice to all the stockholders; and (3)
that it was ultra vires and void. The chancellor held that
the proof showed the resolution was passed at a meeting at
which all stockholders, who appeared on the books, were pres-
ent either in person or by proxy, and that, in view of Sec.
19, Ch. 53, Code, treating stockholders appearing on the com-
pany's books as the only stockholders, so far as the corpora-
tion is concerned, it was not necessary that plaintiffs, whose
names did not so appear, should have had notice. This rule
is certainly correctly applied so far as Mrs. Howard is con-
cerned, because it does not appear any of the officers of the

company knew she was a stockholder. She purchased the stock from her brother W. C. Handlan, who had previously purchased it from defendant Noyes, he having acquired it from Carr, who originally owned one-half of the capital stock. Noyes says he thought Handlan still owned it. At the time of the meeting no certificates of stock had been issued to any of the stockholders, and no transfers made on the books. Noyes was secretary of the company and admits he knew plaintiff J. M. Ritz was a stockholder, notwithstanding his name did not appear as such on the company's books. Whether his knowledge of that fact could be imputed to the company so as to render the stockholders' meeting irregular for failure to notify him thereof, we need not determine, for the reason that, assuming it was irregular, the resolution was, in effect, ratified at a subsequent meeting at which both the plaintiffs were present either in person or by proxy. After they had learned of the alleged meeting and passage of the resolution, plaintiffs made several attempts to have it rescinded. They succeeded in having a meeting of the stockholders called for that purpose. At such meeting on October 23, 1913, John A. Howard, husband of plaintiff holding her proxy, secured the adoption of a resolution providing for the appointment of a committee to make investigation into the sale of the company's stock and the disposition made of the proceeds and report upon all the facts pertaining thereto, The minutes of this meeting, a copy of which is exhibited with plaintiff's bill, show that a very considerable majority of the stock was there represented, and that plaintiff Ritz was present in person and Mrs. Howard by her husband as her proxy. It also shows that the minutes of the previous meeting, and of the meeting of September 24, 1912, were then read. At this meeting, on motion of J. A. Howard, it was voted that, immediately upon adjournment, the secretary should give notice to all the stockholders of the annual meeting to be held on November 4, 1913. The meeting then adjourned to October 30, 1913, at which time it does not appear what business, if any, was transacted. But it is shown by the minutes of a stockholders' meeting held February 17, 1914, at which J. M. Ritz and John A. Howard both appeared in

person, the latter appearing in his own right and as proxy for his wife, that the committee, consisting of said John A. Howard and John J. Coniff, theretofore appointed pursuant to the resolution of October 23, 1913, had filed their report and that it was adopted and made a part of the minutes. That report, however, appears not to be in the record. At this February, 1914, meeting, Mr. Howard offered a resolution directing the officers of the Carr Co. to institute a proper suit or suits in the circuit court of Ohio county against the Casting Co., A. S. List, S. M. Noyes, L. J. Bayha and Peebles Tatum, and such other persons or corporations as may be necessary and proper parties, to restore to the company its property or its actual value. The resolution was put to a vote and lost. The rejection of it was, in effect, a ratification of the one passed September 24, 1912, and cures whatever irregularity, if any such there is, for failure to notify all the stockholders of the meeting.

The chancellor's finding, that a stockholders' meeting was actually held on the 24th of September, 1912, and the resolution authorizing a sale of the company's stock then passed, we think, is fully sustained by the evidence.

The sale of the stock was not ultra vires. It was clearly within the corporate rights and powers of the company to convert its assets and make such disposition of the proceeds as might appear to it to be for its best interest, and that is evidently what it did. The evidence is that the Casting Co. was seriously embarrassed for want of funds and would be unable to continue in business much longer unless it got financial aid; it had borrowed large sums of money on the individual endorsements of some of its stockholders, and its failure to make a financial success in its attempts to manufacture steel castings under the Carr patent had so impaired its credit that it could not borrow any more money. The Carr Co.'s profits depended on the success of the Casting Co. in proving the practical utility of the Carr patent. If it failed in that respect both companies would suffer loss. It would not only result in loss to the Carr Co. of royalties provided for under the contract, but would tend to show that the patent, its principal asset, was of no practical value. The patent

and the royalties, which the Casting Co. had agreed to pay it on all steel castings made under the Carr patent, were the only assets of the Carr Co. It had turned over its small plant to the Casting Co., and was not an operating company. It is quite obvious that the failure of the Casting Co. would seriously impair, if not wholly destroy the value of all the assets of the Carr Co., and realizing this situation the stock was sold and the proceeds turned over to the Casting Co. with the hope and belief that both companies would be materially benefitted. The transaction was a legitimate corporate act. Up to that time experience with the patent had not been a success, and some of the stockholders thought it was on account of the lack of practical experience in the manufacture of steel on the part of Mr. Carr, who was then general manager of the company, and the evidence shows that larger furnaces would have to be built before the patent could be demonstrated to be a practical success. $25,000 was thought to be necessary to make such final test, and the stock was ordered to be sold to raise that amount. The resolution fixed the price at which it should be sold, and there is no evidence that any stockholder was denied the privilege of buying it. Consequently there was no fraud or violation of duty on the part of any of the directors in purchasing the stock, or in turning over the proceeds to the Casting Co. It was all done in accordance with the stockholders' resolution. In fact, a number of persons, besides the directors, became purchasers of the stock, some of them purchasing very much more of it than any one of the directors. Whether it was sold for less than its actual value is a disputed question, the weight of the testimony, we think, proving it brought its full value. Some witnesses testified that it was not considered as having any value, and they purchased it simply in view of trying to save what investment they had already made in the enterprise. It is not proven that it had any value in the open market.

The proceeds were not turned over to the Casting Co. without consideration, as the bill alleges. The stockholders' resolution expressly provides that some arrangement was thereafter to be made for reimbursing the Carr Co., which

should be satisfactory to both companies. What that arrangement shall be seems not yet to be determined.

No settlement had been made of the royalties and other matters arising under the contract between the two companies, and doubtless realizing that its most valuable asset was its patent right, the practical value of which depended on the success of its exploitation by the Casting Co., the Carr Co. may have felt obliged, in order to save itself, to come to the rescue of the Casting Co., and, in view of the situation and circumstances, did not treat the transaction either as a gift or an unqualified loan of the fund, but as an arrangement by which both would likely be benefitted and, if so, both should bear an equitable share of the burden.

The decree of reference expressly requires the Casting Co. to account for the fund, but provides that, in stating the account, it should not be regarded as a debtor for the amount of the $25,000 which it received, but only for so much thereof as was spent for its own benefit "and not for the interest of the Carr Furnace Company, in an effort to prove the Carr furnaces are of practical value." The effect of this provision, as we understand it, is that the Casting Co. is to be charged with the $25,000, in stating the account, and then credited with such portions thereof as it can show were actually spent in its efforts to improve the Carr furnaces and make it of practical value, provided any money was so expended. The agreement between the two companies was made on the hypothesis that the tests previously made by the Carr Co. had fully demonstrated the practicability and value of the furnace, but the unsuccessful efforts thereafter by the Casting Co. to use it on a more extended scale tended to discredit the experiments first made and to show that some improvements and enlargements were necessary. The decree properly allows credit for what sums of money, if any, were so expended, because they were expended for the Carr Company's benefit. The decree will be affirmed.

*Affirmed.*